No. 13,439.

THOMAS-HICKERSON MOTOR COMPANY *v.* CENTRAL WEST CASUALTY COMPANY.

(45 P. [2d] 631)

Decided April 15, 1935.  Rehearing denied May 13, 1935.

Mr. Frank L. Fetzer, Mr. Pierpont Fuller, for plaintiff in error.

Mr. H. Berman, Mr. Fred N. Holland, Mr. Joseph N. Lilly, for defendant in error.

*En Banc.*

Mr. Chief Justice Butler delivered the opinion of the court.

The Thomas-Hickerson Motor Company sued Central West Casualty Company and another to recover on a fidelity bond. The court directed a verdict for the casualty company and dismissed the action as against that company.

The only controversy is over the date of the cancellation or termination of the bond.

The bond was executed August 11, 1930. By its terms it was to continue "until terminated or cancelled as hereinafter provided." The bond also contains the following provisions: "* * * the Surety may cancel this bond at any time by a written notice stating when the cancellation takes effect, served on the Employer, or sent by registered mail to the Employer * * * at least thirty days prior to the date that the cancellation takes effect. The employer may cancel this bond by like notice to the Surety. * * * In the event of the cancellation or termination of this bond as to any Employee, whether by notice *or otherwise,* the right to make a claim hereunder as to such Employee shall cease at the end of six months after such termination."

On August 31, 1931, at the casualty company's request, Clyde H. Gardner, an insurance agent formerly a representative of that company, presented to Mr. Hickerson, an officer of the motor company, a paper, telling him, according to Gardner's testimony, that "there was a termination agreement requested by the company to

terminate the bond.'' Hickerson signed it in behalf of his company, and delivered it to Gardner, who thereupon returned it to the casualty company. It reads as follows:

"Central West Casualty Company,
"Detroit, Michigan.
"Notice To Terminate Suretyship.

"In Consideration of the Central West Casualty Company having agreed to waive any further premium charge on their Bond No. 4234 covering Various Employees in our favor, we hereby release the said Central West Casualty Company from liability for any and all acts of the said Various Employees committed on and after the 11th day of August, 1931.

"Signed at Denver, Colo., this 21st day of August, 1931.

"Thomas-Hickerson Motor Co., Employer.
"A. R. Hickerson, Treas.
"By.....................
(Official's Name and Title.)
"C. H. Gardner, Witness.''

The trial court held that that instrument terminated the bond, and that as the motor company did not make its claim until after the expiration of six months thereafter, it lost its right to enforce the claim. We think that the court was right in so holding. The heading "Notice to Terminate Suretyship'' does not express the nature of the instrument. By that instrument the casualty company was released from liability for any and all acts of the motor company's employees committed on and after August 11, 1931, in consideration of the release of the motor company from liability to pay a premium charge on and after that day. As by mutual agreement both parties were released from further liability, the bond, previously a "continuing'' bond, terminated. Of course, that did not relieve the casualty company from liability for defalcation that had occurred

during the life of the bond; but in order to enforce that liability, the motor company was bound, by the express terms of the bond, to make its claim before the expiration of six months, and this it failed to do.

The judgment is affirmed.

MR. JUSTICE HILLIARD and MR. JUSTICE BOUCK dissent.

MR. JUSTICE BOUCK, dissenting.

The district court's judgment of dismissal on a directed verdict for the defendant should be reversed.

The defendant insurance company admits that a certain employee of the plaintiff motor company embezzled $7,134.19 of the company's moneys during the time the fidelity bond involved here was of full force and effect. There is no doubt that prima facie a cause of action arose under the bond.

The insurer contends, however, that the cause of action is barred by the terms of the bond itself, and this defense is obviously sustained both by the action of the court below and by the majority opinion of this court, affirming the judgment.

It seems to me that such a disposition is wrong.

The only provisions in the bond which could possibly apply in connection with the barring of a claim thereunder are the following, which for obvious reasons I quote verbatim and unabridged, thus fully supplementing the less adequate excerpt given in the majority opinion (the italics being my own):

"1. The term of this bond begins on the 11th day of August, 1930, and continues in force *until terminated or cancelled as hereinafter provided.*

"2. Without prejudice to the rights of the Employer as respects anything that may occur during the period that the bond is in force, the Surety may cancel this bond at any time *by a written notice* stating when the cancellation takes effect, served on the Employer, or sent by registered mail to the Employer at the address herein-

before stated, at least thirty days prior to the date that the cancellation takes effect. The Employer may cancel this bond *by like notice* to the Surety. In case of such cancellation the unearned part of the premium shall be returned to the Employer, if no claim is made hereunder. The Surety's check served on the Employer, or sent by registered mail to the Employer at the address hereinbefore stated, shall be a sufficient tender of the said unearned premium. The Surety may at any time by a like notice terminate its liability under this bond as to future acts of any Employee, returning to the Employer in like manner, at the expiration of all liability hereunder as respects such Employee, the unearned part of the premium concerned with such Employee.

"3. * * *

"4. In the event of the death of any Employee during the term of this bond; or of the suspension, dismissal, or retirement from the service of the Employer of any Employee during the said term; or of the removal by the Employer of the name of any Employee from the said schedule; *this bond shall thereupon terminate as to such Employee without any action on the part of the Surety.* In the event of the cancellation or termination of this bond as to any Employee, *whether by notice or otherwise,* the right to make a claim hereunder as to such Employee shall cease at the end of six months after *such termination.*"

For the purpose of examining in greater detail the foregoing provisions as to termination or cancellation of the bond, I now reproduce therefrom the basic portions, stripped of incidental or immaterial things that could have no bearing upon the question before us:

"The term of this bond * * * continues in force *until terminated or cancelled as hereinafter provided.* * * * Without prejudice to the rights of the Employer * * * *the Surety may cancel this bond at any time by a written notice stating when the cancellation takes effect,* served * * * at least thirty days prior to the date that the can-

cellation takes effect. The Employer may cancel this bond by like notice to the Surety. * * * *In the event* of the death * * * or of the suspension, dismissal, or retirement * * * or of the removal [under a procedure specified in paragraph '3' of the bond] * * * of the name of any Employee * * * *this bond shall thereupon terminate as to such Employee without any action on the part of the Surety.* In the event of the cancellation or termination of this bond as to any Employee, whether *by notice or otherwise,* the right to make a claim hereunder as to such Employee shall cease at the end of six months after such termination.''

Nothing could be clearer to my mind—whether the full, or the immediately foregoing, passage is considered—than that the parties to the bond contemplated only two methods of ''terminating'' or ''cancelling'' the contract: the first by a prescribed notice, fair to both sides as to form, contents, and time of service; the other by the occurrence of one of several specified contingencies, in which latter event the bond was to be automatically terminated as to such employee without any notice or postponement of the termination.

As I understand the law, it is an essential part of the interpretation of any contract whatever, that the language used in a written instrument is to be read in the light of what the parties have said throughout the instrument; in other words, the instrument must be read as a whole. It is never to be read on the assumption that it was to be deviated from by the parties. If such a deviation is claimed, its proof should consist of more than a mere conjecture as to which of two possible meanings should be given to a particular phrase used.

It is at once apparent from the remarks made by the district judge, when announcing his decision to instruct a verdict for the insurance company (Abstract of the Record, page 64), that he took the words ''by notice or otherwise'' (which I have italicized above in my quotations from the bond) to include an alleged termination of

the bond claimed by the defendant to have been effected by the plaintiff's executing exhibit A. It is also plain that the lower court entered judgment against the motor company solely because of this interpretation (or, rather, misinterpretation) of the bond. Exhibit A is as follows:

"Release Fidelity

"Fidelity and Surety Department

"Central West Casualty Company

"Detroit, Michigan

"Notice to terminate suretyship

"In consideration of the Central West Casualty Company having agreed to waive any further premium charge on their Bond No. 4234 covering Various Employees in our favor, we hereby release the said Central West Casualty Company from liability for any and all acts of the said Various Employees committed on and after the 11th day of August, 1931.

"Signed at Denver, Colo., this 21 day of Aug., 1931.

"Thomas-Hickerson Motor Co.

"Employer.

"A. R. Hickerson, Treas.

"C. H. Gardner        "By...............

"Witness        (Official's Name and Title)

"Note: If the Employer is a corporation this form should be executed by an officer who has authority to bind the corporation; if a co-partnership, it should be signed by one of the partners."

The evidence shows that the insurance company was the party that prepared not only the bond itself, but also the above "notice to terminate suretyship." Hence, under an elementary rule, both instruments are to be read in the way most favorable to the other party, namely the plaintiff motor company, and least favorable to the draftsman and author of the instruments, namely the insurance company. This is the first compelling reason that calls for a conclusion contrary to the one arrived at by the trial court.

Moreover, there is an equally cogent argument on a second ground, universally recognized. We must not forget the general principle, heretofore announced in unmistakable terms by this court, that specifically in insurance contracts all ambiguities arising from the language used must be resolved in favor of the insured and against the insurer. *Finding v. Ocean Accident and Guarantee Corporation,* 65 Colo. 332, 177 Pac. 143.

It cannot be denied that the phrase "by notice or otherwise" requires a context to elucidate its meaning. This context in the present case brings us directly back to the express provisions of the bond as I have quoted them, supplying just two methods of "terminating" or "cancelling" the bond, namely the one "by notice" and an automatic one which the instrument specifically provided for "otherwise" than "by notice." These two methods, I think, were undoubtedly contemplated as all the methods the parties intended to be covered when they agreed that "the term of this bond * * * continues in force until terminated or cancelled *as hereinafter provided.*"

Personally I see no ambiguity in the language when compared with the remainder of the bond. But, even if there were an ambiguity, it must necessarily—under the rules and principles above referred to—be dispelled by taking the meaning that favors the plaintiff motor company.

The expression "or otherwise" must therefore be given a restricted sense as referring to kindred matters. Compare: *New York L. Ins. Co. v. McDearmon,* 133 Mo. App. 671, 114 S. W. 57. Its meaning must be ascertained, not by finding what is its widest possible meaning under any and all circumstances, but by limiting it to the signification most favorable to the insured, be that broad or narrow.

It is no answer to these fundamental propositions to say that, if there was no termination or cancellation of the bond in one of the two ways expressly provided for,

then the above quoted "notice to terminate suretyship" must be taken to be a termination or cancellation of the bond because there would be nothing else to start the running of the limitation period of six months. Such a limitation period does not have to begin running. In fact, the bar of this limitation is wholly separate and apart from the question of liability; it may or may not be invoked. It has to do only with the remedy. It is one thing to say that a valid claim exists; it is a vastly different thing to say that for some affirmative reason the claim cannot be enforced. The two things are distinct from each other. The first—which relates to the cause of action—may be hotly litigated, while the second —which affects only the remedy—may in a particular instance not be involved at all. The latter, as potentially an affirmative defense, may be expressly or impliedly waived, abandoned or omitted. In any of these contingencies the validity of the claim stands absolutely independent. And in any of these contingencies it would be entirely a question whether the claim itself is valid or not, and in no way would it concern us when the action was brought, or how long it was delayed.

That in the case at bar the defendant insurance company has not entitled itself to the protection of the affirmative defense seems demonstrated by all the facts and circumstances as found in the particular documents and in the conduct of the parties.

The above reasoning is strongly corroborated, I think, not only by what the aforesaid "notice to terminate suretyship" says, but even more by what it omits to say. The "notice" purports to be nothing but a release as to future transactions, and obviously was intended to make sure that no claim should arise on account of anything that might happen from August 11, 1931, on. It does not refer directly or indirectly to any liability that might have, or actually had, already accrued before the date last given. And (something peculiarly significant) it does not speak or hint in any way regarding the remedy

for enforcing such an accrued liability, nor regarding the cutting off of an affirmative right to a particular kind of notice which should fix—as distinguished from the date of termination of future liability—a date affecting vested rights not covered by the release.

This release was signed at the instance of the drafting party on August 21, 1931, ten full days after the August 11 agreed upon therein as the date after which further liabilities should be excluded. Was the bond in force during those ten days? If the release had not been signed until after September 11 (and thus more than thirty days after the "termination"), fixing the same August 11 as the calendar limit of future liabilities, would that have made any difference? And if the release before us had been signed after February 11, 1932 (or more than six months after the "termination"), would the motor company have been deprived of its contract right altogether to recover on claims that had accrued by August 11, 1931, simply because no action could then possibly be instituted within six months after the "termination of suretyship?"

Any reasonable answer to the foregoing question seems to call for limiting the release (or "notice to terminate suretyship") to what it says, without reading into it what amounts to the forfeiture of vested rights. Similarly reasonable would appear the view that according to its very terms the release effected only a pro tanto cancellation of the bond; and that the failure to express an intent to do more than its language clearly says must be construed against the insurance company and in the motor company's favor.

Under the original contract the premium represents a consideration exactly correlative with the insurance company's obligation. It is fair to assume that, under the language of the "notice" above quoted, the release to the insurance company from liability for anything occurring from August 11, 1931, onward, is exactly counterbalanced by the release of the motor company from lia-

bility for the subsequent period. No consideration moving from the insurance company, or moving to the motor company, is in evidence as a consideration for the surrender of the valuable right of forbearance in the form of a particular kind of notice that postpones or otherwise specially conditions the running of a particular limitation which the record shows was not even discussed or mentioned. It would be different, of course, if the contract were with a mutual company, where potential liabilities of both the insurer and the insured are balanced against each other. A fortiori, cancellation may be accomplished without a prescribed formality when the power to do so is expressly reserved. Or, again, the right to a required notice may be waived. None of these situations is shown by the record here. In my opinion the motor company had nothing to apprise it that, instead of a mere pro tanto cancellation, there was to be a complete cancellation of the bond, past and present and future. The majority opinion says, it is true, that one Gardner, former representative of the insurance company, told Mr. Hickerson of the motor company that the release "was a termination agreement requested by the company to terminate the bond." However, Hickerson testified that Gardner brought the paper to him and asked him to sign it, and that this colloquy ensued: H.— "What have you got?" G.—"I have a release." H.— "Have a release for what?" G.—"Central West Casualty Company." H.—"Release, *how does that affect our insurance, our coverage?*" Q.—"*It does not,* they have ceased doing business in Colorado."

Hickerson further testified: "Mr. Thomas took care of the insurance end of it. I did not want to sign it but to save him a trip I said, 'All right.' The reason I asked the question, 'Would it affect our coverage?' was because we figured insurance as coverage." This would thus seem to constitute a clear case of conflicting evidence and surely ought to have been submitted to the jury, without taking the case from them by a directed verdict.

504

See, generally, on the various points above discussed: Couch, Cyc. of Ins. Law, §§188-188b, 1406.

My conclusion is that the judgment of affirmance pronounced by the majority of this court should be changed to a judgment of reversal.

MR. JUSTICE HILLIARD concurs in this opinion.